# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
## No. 22-0245V

|  |  |
|---|---|
| MARGARET CHALGREN,<br><br>                     Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Chief Special Master Corcoran<br><br>Filed: May 5, 2025 |

*Kathleen Margaret Loucks, Lommen Abdo Law Firm, Minneapolis, MN, for Petitioner.*

*Jamica Marie Littles, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On March 3, 2022, Margaret Chalgren filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on October 9, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

Respondent determined that he was amenable to informal resolution, and the parties negotiated, but reached an impasse, and have now fully briefed entitlement and damages (ECF Nos. 27-32, 39, 41, 42). For the reasons set forth herein, I find that Petitioner is entitled to compensation, and award damages for actual pain and suffering in the amount of $40,000.00, plus $302.34 for out-of-pocket expenses (including travel expenses calculated at the business rate).

## I.    Factual Evidence

### A.  Medical Records

Petitioner received a flu vaccine in her left deltoid on October 9, 2020. Ex. 1 at 6. The vaccine was administered during a preoperative examination in anticipation of eye surgery, which she underwent a week later.  Ex. 4 at 201; Ex. 7 at 10. The operative report for her eye surgery indicates that she had a condition, dermatochalasis, where excess skin obstructed her peripheral vision. *Id.* She followed up with her eye surgeon the following month, saying she was doing well. *Id.* at 11. Unsurprisingly, neither of these records mentions her shoulder.

On January 6, 2021 – just under three months after vaccination – Petitioner saw her primary care physician Dr. Jennifer Lewis for left shoulder pain. Ex. 4 at 212. The record describes her pain as being present "since flu vaccine on 10/9/2020," stating that the pain "started in October after she received her flu vaccine." *Id.* at 214, 215. She had some relief with ibuprofen. *Id.* On examination, she had tenderness over the left deltoid muscle and pain over her lateral shoulder with external rotation, abduction, internal rotation, and adduction. *Id.* at 216. Dr. Lewis assessed Petitioner with acute pain of her left shoulder, and recommended non-steroidal anti-inflammatory medications, ice, rest, and physical therapy ("PT"). *Id.*

Nearly four months later (April 28, 2021), Petitioner called Dr. Lewis, stating that her shoulder was not getting any better and requesting an MRI. Ex. 4 at 219. Dr. Lewis inquired whether Petitioner had done PT, because insurance typically would not approve an MRI without a trial of PT. *Id.* at 220.

It appears that Petitioner did not follow up with Dr. Lewis. Instead, she saw orthopedist Dr. Scott Holthusen the following week – now nearly seven months after vaccination (May 5, 2021). Ex. 8 at 8. On the new patient form, she described "pain since flu shot," that she rated as zero out of ten when sitting and eight out of ten when active. *Id.* at 15. There are two versions of this appointment record, one that Dr. Holthusen signed on the appointment date, May 5th (Ex. 8 at 8), and one Dr. Holthusen signed nine months later, on February 9, 2022 (Ex. 15 at 6).

The version of the May 5th record signed on the appointment date explains that Petitioner had a vaccination on October 9, 2020, and that the nurse told her that the needle had broken, but had not stayed in her shoulder. Ex. 8 at 8. The record states that Petitioner "did fine initially, however indicates pain one week later." *Id.* Since that time, she had increasing pain with reaching away from her body or behind her back. *Id.* She had been trying home exercises, without relief. *Id.* She had difficulty sleeping on her left side. *Id.* Dr. Holthusen diagnosed Petitioner with left shoulder subacromial bursitis with impingement. *Id.* at 7-8. They discussed a cortisone injection, but because Petitioner had her second COVID vaccine less than two weeks prior, Dr. Holthusen recommended that she return for the injection after that time had passed. *Id.* He also recommended PT. *Id.*

Petitioner later requested that Dr. Holthusen amend the May 5th appointment record through a form that is not dated. Ex. 8 at 34. The record stated she had pain a week after vaccination, and she now explained this was "partly true but not specific enough." *Id.* She requested that Dr. Holthusen amend the record to reflect that she had pain following vaccination, which she initially thought was normal. *Id.* However, "the pain kept worsening until after about a week I couldn't move my arm without intense pain." *Id.* The amendment request was made due to her pending vaccine injury claim and the "need [for] an accurate record regarding onset of pain." *Id.*

The amended version of the May 5th record signed by Dr. Holthusen in February 2022 states that Petitioner "noted what she believed to be initial injection related pain, however indicates the pain progressively got worse over the next week until she could not move her arm without intense pain." Ex. 15 at 6. Since that time, she had continued pain with reaching away from her body or behind her back. *Id.* Thus, the changes to the record bolster Petitioner's contention that the onset of her pain was within the time set forth in the Table. The record is otherwise identical in relevant respects to the original, unamended, record.

Petitioner returned to Dr. Holthusen on May 24, 2021, and was given a left shoulder steroid injection and referred for PT.[3] Ex. 8 at 16. Petitioner underwent a PT evaluation for her left shoulder the following month, on June 23, 2021. Ex. 9 at 11. The record indicates that the onset of her pain was sudden, beginning on October 9, 2020 following a "flu shot gone wrong." *Id.* at 11, 21, 28. Her left shoulder range of motion ("ROM") was

---

[3] The record includes a Vaccine Adverse Event Reporting System ("VAERS") report submitted on the same day as Petitioner's first steroid injection (May 24, 2021). Ex. 10. The report is for an incident relating a flu vaccine administered on October 6, 2020 – three days *before* Petitioner's vaccination – with an onset date of October 7, 2020 – two days *before* vaccination. *Id.* Some of the demographic details in the VAERS report appear to match Petitioner, but the vaccination date does not, and VAERS reports do not include the patient's name. For these reasons, and because VAERS reports are not of significant evidentiary value in any event (because they contain only self-reported information that is not submitted for purposes of receiving medical treatment), I do not give this report any weight.

mildly reduced in all planes compared to her right shoulder.[4] *Id.* at 11. She rated her pain as four out of ten, stating that it was intermittent and ranged between two and six, and was generally worst at night and best in the morning. *Id.* at 21.

Petitioner attended two more PT sessions in July 2021. Ex. 9 at 25. At her final session on July 14th, she was feeling better, but still had soreness with reaching. *Id.* Her left shoulder ROM had improved, but she still had pain at end ranges. *Id.* at 10, 25.

Petitioner did not seek further care for her shoulder for over five months. On December 27, 2021, she returned to Dr. Holthusen. Ex. 8 at 30. Her previous cortisone injection had provided "great relief" for three months, but over the last couple of months her pain had been increasing. *Id.* Dr. Holthusen administered another cortisone injection and recommended that she continue home exercises. *Id.* at 30-31.

Following another lengthy treatment gap, Petitioner returned to Dr. Holthusen on August 29, 2022 (eight months from December 2021). Ex. 11 at 9. Her pain had returned since her last injection, and she wanted to discuss other options. *Id.* Dr. Holthusen ordered a left shoulder MRI to determine if there was any pathology other than bursitis. *Id.* at 9-10. The MRI record states that Petitioner had a history of "[l]eft shoulder pain for 2 years." *Id.* at 11. The MRI showed mild supraspinatus tendinosis, mild degenerative arthrosis, and labral fraying/degenerative tearing. *Id.* at 12.

Petitioner saw orthopedist Dr. Charles Eggert to review the MRI on September 30, 2022. Ex. 11 at 14. She explained that following a flu vaccine she had significant pain and burning sensation, which had been ongoing for two years and was slowly improving. *Id.* She rated her pain as two out of ten, which she considered "livable." *Id.* Dr. Eggert recommended continued observation and home exercises, with a repeat steroid injection if she experience a flareup of symptoms. *Id.* There are no further treatment records.

### B. Testimonial Evidence

Petitioner submitted an affidavit and three declarations in support of her claim. Exs. 3, 12, 13, 14. When Petitioner received the flu vaccine, she was sitting in a chair and the nurse was standing. Ex. 3 at ¶ 4. When the nurse pulled the needle out, she said "Oh, it broke" and that it "was weird." *Id.* Petitioner thought it was strange, but because the nurse did not seem too concerned, she did not inquire about it. *Id.*

Twenty-four hours after receiving the vaccine, Petitioner's shoulder began hurting. Ex. 3 at ¶ 5. She thought it was normal injection-related pain and expected it to improve with time, but instead it continued to get worse. *Id.* After a week, it had become "incredibly painful." *Id.* She took ibuprofen and modified her activities, hoping it would improve. *Id.*

---

[4] Petitioner's ROM in flexion was 143 degrees on the left and 157 degrees on the right; in abduction, 143 degrees on the left and 160 degrees on the right; and in extension, 62 degrees on the left and 70 degrees on the right. Ex. 9 at 11.

She could not sleep on her left side anymore, and was fatigued every day because she did not sleep well. *Id.* She could no longer do her online exercise class because so many movements caused pain. *Id.* Her shoulder "ached constantly" and the pain was "intense." *Id.* She had pain while brushing her hair, and showering was difficult. *Id.* She could not go grocery shopping without help because she could not lift heavy items into the cart. *Id.*

Petitioner's shoulder pain seemed to get worse, with periods of relief, over the next couple of months. Ex. 3 at ¶ 6. Sometimes she would hear a crackle or pop when she moved her shoulder, and she felt a "weird sensation that feels like I have a tunnel in my arm where the needle went in." *Id.* Her husband thought she should go back to the doctor, but she was nervous about COVID-19 exposure, as she was taking care of two grandchildren three days a week as well as visiting and helping her 89 year old mother once or twice a week. *Id.* For those reasons, she continued using ibuprofen and ice and hoping the pain would go away eventually. *Id.*

Petitioner adds that she did not initially seek medical treatment for her left shoulder because she did not consider it an emergency. Ex. 12 at ¶ 2. During this time, she sought in-person care for eye surgery and a surgical follow-up appointment. *Id.* She explains that the eye surgery was required as she "had cancer in [her] eye."[5] *Id.* She adds that she "obviously did not report any shoulder symptoms to my eye doctor as I did not think it was appropriate to discuss my shoulder with an eye specialist, nor was I asked about my shoulder at these appointments." *Id.*

Petitioner adds that she did not have a virtual appointment or call or email her doctor about her shoulder pain in the initial months after vaccination because she thought the pain would go away. Ex. 12 at ¶ 3. Furthermore, she expected that if she did call or email, her doctor would schedule an in person appointment – which she wanted to avoid during this time for conditions that she did not deem serious or an emergency. *Id.*

When her shoulder had not improved by January 2021, Petitioner worried that part of the needle might have broken off in her arm, and saw Dr. Lewis. Ex. 3 at ¶ 8. She was very concerned about COVID-19 exposure, but "could not take the pain and the sleepless nights anymore." *Id.* She had also searched online 'why does my shoulder still hurt 3 months after getting a vaccine?' and learned about SIRVA, and that others had experienced what she had. *Id.*

Dr. Lewis did not think the needle was in Petitioner's arm, and did not think imaging was needed, recommending PT instead. Ex. 3 at ¶ 9. Petitioner opted to do home

---

[5] Petitioner asserts that her October 2020 eye surgery was due to cancer. Although I have no reason to question her assertion, Petitioner has not cited, and I have not noted, any medical records that would support it. For purposes of this Decision, it does not matter whether the surgery was for cancer or another pressing condition (which I find the medical records support this was, given that her condition was obstructing her vision). Ex. 7 at 10.

exercises using resources she found online. *Id.* at ¶ 9. Unfortunately, these exercises did not seem to help, and some of them hurt. *Id.* at ¶ 10. During this time, her shoulder pain persisted, with some days being worse than others. *Id.* at ¶ 10. She used her left arm as little as possible, using her right arm for almost everything. *Id.*

In the beginning of April, Petitioner's daughter – who knew she had shoulder pain from a vaccination – noticed that Petitioner was still suffering, and told a friend who is a nurse about it. Ex. 3 at ¶ 11. The friend told Petitioner's daughter about the Vaccine Program. *Id.* Petitioner then called Dr. Lewis to ask about an x-ray or MRI. *Id.* Dr. Lewis wanted to see PT records, which Petitioner did not have because she had done exercises at home due to COVID. *Id.* Petitioner then decided to see an orthopedist. *Id.*

Dr. Holthusen took an x-ray and confirmed that there was not a piece of needle in Petitioner's shoulder. Ex. 3 at ¶ 12. He explained that she had inflammation in her bursa that was causing her symptoms. *Id.* The cortisone injection she received in May 2021 made her shoulder feel "a lot better." *Id.* at ¶ 14. At this point, she had received COVID vaccines and felt better about going to a clinic, so she started PT in June. *Id.* Her therapist gave her exercises to work on at home. *Id.* She did three PT sessions and did not return because she felt it was a waste of money, as she could do the exercises on her own at home. *Id.*

In early August 2021, Petitioner's shoulder pain started to return. Ex. 3 at ¶ 15. The pain worsened, and in late December 2021 she received a second cortisone injection. *Id.* at ¶ 17.

In a declaration signed on January 12, 2024, Petitioner states that she still needs help with jackets because her arm does not bend the way it used to, and if it does, it causes pain. Ex. 12 at ¶ 6. She sometimes "get[s] stuck in my coat like a two year old if I don't have help." *Id.* She continues to experience pain when reaching behind to her left. *Id.* And she still cannot sleep on her left arm or do exercises that put weight on her left shoulder. *Id.*

Petitioner requested that Dr. Holthusen amend his record because it was inaccurate. Ex. 12 at ¶ 4. She had not reviewed her medical records until after she engaged an attorney, and when she discovered the inaccuracy, she requested the amendment in good faith. *Id.* She does not believe that Dr. Holthusen would have amended his note if he thought her request was for an improper purpose. *Id.*

Theodore Chalgren, Petitioner's husband, submitted a declaration on her behalf. Ex. 13. He states that when Petitioner came home after vaccination, she told him that her shoulder was aching, but she assumed it was normal injection-site soreness. *Id.* at ¶ 4. Therefore, Petitioner said she would try to "tough it out" until the pain dissipated. *Id.* Instead the pain worsened every day, expanding from just the injection site to her entire

shoulder. *Id*. Mr. Chalgren became alarmed at seeing Petitioner wince in pain from simple motions such as reaching for a coffee cup. *Id*.

Mr. Chalgren explains that Petitioner "is not one to complain." Ex. 13 at ¶ 5. She believed that the pain would go away and tried to work through it, doing exercises at home. *Id*. During this time, he had to help her with many tasks she previously could do on her own. *Id*. Petitioner's sleep quality, and her quality of life, suffered. *Id*. Their son bought a baby carrier to help her hold her grandchild. *Id*.

Attached to Mr. Chalgren's declaration is an unsigned statement dated September 17, 2021.[6] Ex. 13 at 4. Mr. Chalgren states that Petitioner's shoulder pain began the evening of vaccination, and recounts an episode where Petitioner had difficulty reaching for a glass on the end table while they watched television. *Id*.

Petitioner's son, Zack Chalgren, submitted a declaration in support of Petitioner's claim. Ex. 14. Petitioner has helped care for his children (Petitioner's grandchildren) for years, and Zack affirms that there are things Petitioner could do before her injury that she can no longer do. *Id*. at ¶ 3. She cannot hold the baby without a baby carrier. *Id*. She moves cautiously when performing simple tasks such as washing dishes, folding laundry, or sweeping. *Id*. She cannot play with her grandchildren with the same energy, and he has witnessed her guarding her shoulder. *Id*.

Attached to Zack Chalgren's declaration is a signed statement from him dated March 3, 2022.[7] Ex. 14 at 3. Zack states that Petitioner cares for his children several days a week while he works at home. *Id*. After Petitioner's October 2020 vaccination, he states that there was "an obvious change in her physical movements and abilities." *Id*. When she arrived in the morning, she would "wince with pain as she tried to take her coat off," leading him to help her with this – something that had never happened before vaccination. *Id*. She also modified how she did other household tasks such as lifting her grandchildren, opening doors, folding laundry, and vacuuming. *Id*. Some days, the pain was too much and she had to leave early. *Id*.

## II.    Factual Findings and Ruling on Entitlement

### A.  Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the

---

[6] In his declaration, Mr. Chalgren refers to this statement and states that it is a "true and correct copy of my statement dated September 17, 2021." Ex. 13 at ¶ 2.

[7] In his declaration, Zack Chalgren refers to this statement and states that it is a "true and correct copy of my statement dated March 3, 2022." Ex. 14 at ¶ 2.

factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[8] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4

---

[8] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

(Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five month mark.

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C. F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

### B.  Parties' Arguments on Entitlement

Petitioner argues that the fact that she did not seek medical treatment within 48 hours of vaccination does not mean that her shoulder pain did not begin within this window. Petitioner's Motion for Ruling on the Record, filed Jan. 29, 2024, at *10 (ECF No. 39) ("Mot."). Petitioner has submitted testimonial evidence stating that her pain began less than 48 hours after vaccination, and her subsequent medical records are consistent with that contention. Mot. at *10-15. It is common for a SIRVA petitioner to delay treatment, thinking that the injury will resolve on its own. *Id.* at *12. And "it is logical to assume petitioner may have discounted his shoulder injury until educating himself through internet research regarding SIRVA." *Id.* (citing *Smallwood v. Sec'y of Health & Human Servs.*, No. 18-0291V, 2020 WL 2954958, at *10 (Fed. Cl. Spec. Mstr. Apr. 29, 2020).

Petitioner also argues that postponing treatment for a limited number of months does not establish that the onset of pain did not occur immediately following vaccination. Mot. at *13. Although Petitioner had unrelated in-person care soon after vaccination, she notes that "this was with an eye specialist for cancer removal."[9] *Id.* Petitioner asserts that the fact that she did not mention her shoulder pain to her eye doctor does not mean that her shoulder pain was not present, citing *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383-84 (Fed. Cir. 2021) ("a patient having a heart attack is not likely to mention his runny nose, nor is his physician likely to record it"). *Id.*

Respondent emphasizes "petitioner's delayed presentation for care," and argues

---

[9] Petitioner has not cited medical records for the proposition that her eye surgery was related to cancer.

that absent contemporaneous corroborating evidence, "the subjective statements of petitioner and her family alone do not establish that her alleged injury satisfied the SIRVA Table requirements." Respondent's Response, filed Apr. 8, 2024, at *7 (ECF No. 41) ("Resp."). Respondent views the actual onset of Petitioner's left shoulder symptoms as "unknown as she did not present for care of her left shoulder until January 6, 2021, almost three months after her October 2020 flu vaccination." Resp. at *8. In describing the onset of her pain to treaters, Petitioner did not specify the date on which her symptoms began and "consistently made vague statements about the onset of her pain," using words such as since, after, or following vaccination, and alluding to a "flu shot gone wrong." *Id.*

Respondent adds that Petitioner told Dr. Holthusen that she "did fine initially" after vaccination, but had pain only the next week. Resp. at *8. After engaging counsel, moreover, Petitioner requested that Dr. Holthusen amend this record – 16 months after vaccination, and over nine months after the record was created. *Id.* Respondent asserts that there are "no contemporaneous medical records or other objective evidence to corroborate" Petitioner's testimonial statements. *Id.* And Respondent contends that I cannot make a finding of fact based on witness testimony alone. *Id.* at *9 (citing *Clavio v. Sec'y of Health & Human Servs.*, No. 17-1179V, 2020 WL 1672956, at *7 (Fed. Cl. Spec. Mstr. Mar. 11, 2020), and *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). *Id.*

Respondent further argues that it is "speculative to assign a specific date of onset," asserting that onset may have occurred any time from one week after vaccination (as Dr. Holthusen 's unamended May 2021 record suggests) to January 2021 (when Petitioner first presented for care). Resp. at *10. Given that Petitioner sought care for other conditions and delayed seeking care for her shoulder, Respondent asserts that the court should afford little weight to Petitioner's testimonial evidence. *Id.*

In reply, Petitioner emphasizes that when she first sought care, she reported left shoulder pain *since* her October 2020 vaccination. Petitioner's Reply, filed Apr. 22, 2024, at *1 (ECF No. 42) ("Reply") (emphasis in original). And citing Dr. Holthusen's amended record, Petitioner asserts that she told him she had initial injection-related pain. Reply at *1.

Although medical records "do not point with precision to a 48-hour onset, they are entirely consistent" with such an onset. Reply at *2. And "one cannot reasonably expect that treating physicians would include precise onset information relevant only to this legal proceeding" in their records. *Id.* (citing *Goldman v. Sec'y of Health & Human Servs.*, No. 16-1523V, 2020 WL 6882186, at *15 (Fed. Cl. Spec. Mstr. Nov. 2, 2020), and *Niemi v. Sec'y of Health & Human Servs.*, No. 19-1535V, 2021 WL 4146940, at *4 (Fed. Cl. Spec. Mstr. Aug. 10, 2021)). Petitioner argues that the Vaccine Act "does not require that symptoms be recorded within a specific timeframe to be preponderantly established" – rather, it requires only that onset occur within the relevant timeframe. Reply at *2. And the

fact that she did not report shoulder pain to her eye surgeon does not mean that she was not experiencing shoulder pain at the time of her surgery. *Id.* at *4.

With respect to Petitioner's request that Dr. Holthusen amend his May 5, 2021 record, Petitioner argues that patients have a right under federal law to seek changes to inaccurate records. Reply at *4. Petitioner asserts that it is unfair for her request for a record amendment that was ultimately granted to be treated as suspect. *Id.* Petitioner believes that if she had *not* requested amendment of her record, "the inaccurate medical record would simply be used against her." Reply at *4-5. This accordingly leaves her in a no-win situation. *Id.*

### C. Factual Findings on Onset

I find that the record preponderantly supports a finding that the onset of Petitioner's shoulder pain likely began within 48 hours of vaccination. It is true that Petitioner did not seek care until nearly three months after vaccination. But I have previously found that it is not uncommon for SIRVA petitioners to delay seeking care, in hopes that their condition will resolve without formal treatment. *See Diaz v. Sec'y of Health & Human Servs.*, No. 20-1003V, 2023 WL 8440873, at *8 (Fed. Cl. Spec. Mstr. Nov. 1, 2023) (finding onset occurred on day of vaccination, even though the petitioner did not seek treatment until over three months later); *Graczyk v. Sec'y of Health & Human Servs.*, No. 21-0376V, 2023 WL 4573868 (Fed. Cl. Spec. Mstr. June 16, 2023) (finding onset within 48 hours where Petitioner first sought care two months after vaccination).

In addition, although there is no requirement that a medical record specify the date of onset of symptoms, in this case there *is* a medical record with this information – and as the most contemporaneous medical record, it merits weight. *See* Ex. 4 at 214 ("[l]eft shoulder pain since flu vaccine on 10/9/2020"). This is compelling evidence, which is well-supported by additional medical records and testimonial evidence. I disagree with Respondent's suggestion that onset is unknown or speculative because Petitioner did not present for care until nearly three months after vaccination. The Vaccine Act allows special masters to make a variety of fact findings via the standard of *preponderant evidence. Roberson v. Sec'y of Health & Human Servs.*, No. 21-2309V, 2025 WL 605724, at *7 (Fed. Cl. Spec. Mstr Jan. 24, 2025) (a specific onset date is not required; rather, a petitioner may demonstrate onset by preponderant evidence). And the Vaccine Act specifically contemplates that the onset may not be recorded, or may be recorded incorrectly, requiring a factual finding by a special master. Section 13(b)(2).

Admittedly, the unamended version of Petitioner's May 5, 2021 appointment with Dr. Holthusen could suggest an onset of one week after vaccination. Ex. 8 at 8. If this were the *only* medical record documenting the onset of Petitioner's shoulder pain, or even the *first* treatment record, Respondent's opposition would merit greater weight. But the most contemporaneous record – the January 2021 appointment with Dr. Lewis, which occurred just under three months after vaccination – states that Petitioner's pain had been

present *since vaccination.* Ex. 4 at 212. And Dr. Holthusen later amended his record – suggesting that he did not consider Petitioner's requested amendment to be inaccurate. Finally, Petitioner told her physical therapist that her pain began on the date of vaccination with a "flu shot gone wrong." Ex. 9 at 11, 21, 28.

The fact that Petitioner requested amendment of Dr. Holthusen's record neither helps nor harms her case with respect to onset, in light of the circumstances of this case. Admittedly, there are situations in which a request to amend a record raises questions about the accuracy of the proposed amendment. But in this case, there is no reason to believe that Petitioner requested the amendment for an improper purpose. This is because the amendment that she requested is *consistent with* the remaining medical records – suggesting the medical record may in fact have been inaccurate. And of course, the fact that Dr. Holthusen *actually amended* the record speaks to his belief that Petitioner was correct about the record's inaccuracy.

### D. Factual Findings on Remaining SIRVA QAI Criteria and Statutory Requirements

The remaining QAI requirements are not disputed,[10] and I find that they are preponderantly satisfied. The record does not contain preponderant evidence that Petitioner had a history of left shoulder pain or any other condition that would explain her post-vaccination symptoms. Ex. 4. She exhibited reduced ROM, and her pain and ROM limitations were limited to the vaccinated shoulder. Ex. 8 at 8; Ex. 9 at 11.

The statutory requirements are also preponderantly established. Petitioner received a covered vaccine in the United States. Ex. 1 at 6. She experienced residual effects of her injury for more than six months. Ex. 8 at 8. And she states that she has not previously collected an award or settlement of a civil action for damages for her vaccine-related injury. Ex. 3 at ¶ 19. Thus, Petitioner is entitled to compensation.

## III.    Damages

### A. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section I-II of *Timberlake v. Sec'y of Health & Human Servs.*, No. 20-1905V, 2025 WL 721730 (Fed. Cl. Spec. Mstr. Feb. 19,

---

[10] Respondent confirms that other than onset, "[t]he other SIRVA Table QAI requirements are met." Resp. at *7 n.3.

2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00," in addition to certain unreimbursable expenses resulting from the vaccine-related injury. Section 15(a)(1), (a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[11]

### B. Parties' Damages Arguments

Petitioner seeks a pain and suffering award of $75,000.00, relying on decisions in *Attig* and *Marino*, both of which involved awards of this magnitude.[12] Mot. at *21-22. Petitioner also requests out of pocket expenses, including travel expenses relating to her care, in the amount of $302.34. *Id.* at *22.

Petitioner underwent two cortisone injections, three PT sessions, an MRI, and x-rays. Mot. at *19. While her initial treatment was delayed due to COVID, she had a total of ten visits for SIRVA-related treatment, in addition to doing home exercises. *Id.* At her May 2021 orthopedist appointment, she rated her pain eight out of ten with activity. *Id.* The following month, her pain ranged between two and six out of ten, having improved after a cortisone injection the previous month. *Id.*

Petitioner experienced pain that disturbed her sleep, and made it difficult to get dressed, hold her grandchildren, lift weights, and reach behind her. Mot. at *19. She asserts that her pain and limitations have continued for over three years – although her last medical appointment for her shoulder was less than two years after vaccination, with lengthy gaps before that time, and her last treatment intervention was her second cortisone injection just over a year after vaccination. *Id.*

Respondent proposes a pain and suffering award of $22,000.00. Resp. at *13. Respondent characterizes Petitioner's injury as a mild SIRVA based on her delayed presentation, limited treatment, and repeated treatment gaps. *Id.* at *14-15. Respondent cites decisions in *Ramos*, *Mejias*, *McGraw*, and *Valdez*, with pain and suffering awards

---

[11] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[12] *Attig v. Sec'y of Health & Human Servs.*, No. 17-1029V, 2019 WL 1749405 (Fed. Cl. Spec. Mstr. Feb. 19, 2019); *Marino v. Sec'y of Health & Human Servs.*, No. 16-0622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018).

from $35,000.00 to $45,000.00, as comparable cases.[13] *Id.* at 15-16. Respondent argues that an award of $75,000.00 "is not consistent with the medical records" or precedent, and that his proposed award of $22,000.00 "reflects the weaknesses of the instant case." *Id.* at 15, 21 n.12.

Respondent argues that *Attig* and *Marino* are not good comparables, since they involved petitioners with more severe injuries. *Id.* at *18-20. The *Attig* petitioner, for example, sought treatment within two weeks of vaccination, attended more PT, and had higher pain ratings. *Id.* And Respondent emphasizes that *Marino* is now over six years old, and suggests that Petitioner's "selective citation to *Marino* suggests that the case may be an outlier, when compared to more recent cases." *Id.* at *20 n.11. Additionally, *Marino* involved a more serious injury, with higher pain ratings and greater ROM deficits and MRI findings. *Id.* at *20-21. Respondent proposes an award lower than *McGraw* and *Valdez*, citing Petitioner's initial treatment delay and lengthy treatment gaps. *Id.* at *17-18.

Respondent agrees that Petitioner is entitled to reimbursement of $267.90 for uncontested unreimbursed medical expenses, but argues that reimbursement for related travel expenses should be at the IRS medical mileage rate rather than the business rate, which would result in reimbursement of $290.60 in unreimbursed expenses. Resp. at *13, 21 n.13. Although in this case the difference between applying the medical and business rates is only $11.74, Respondent asserts that "a sound determination as to the appropriate mileage rate is crucial as it has broad implications in all Program cases involving reimbursement for vaccine-related travel expenses." *Id.* at *22 n. 14.

Respondent contends that the IRS medical rate is the appropriate rate for calculation of Petitioner's travel expenses related to medical appointments for her vaccine injury. Resp. at *21-25. Respondent argues that the special master in *Williams v. Sec'y of Health & Human Servs.*, No. 90-2239V, 1996 WL 608455 (Fed. Cl. Spec. Mstr. Oct. 10, 1996) applied the IRS "business rate" rather than the "medical rate," and that special masters have subsequently relied on *Williams* and applied the business rate. *Id.* Respondent views *Williams* as flawed and urges that I decline to follow it and apply the lower medical rate. *Id.*

Petitioner replies that Respondent's proposed award of $22,000.00 is "far below other reasoned awards." Reply at *5. Petitioner asserts that *McGraw* involved a very mild SIRVA lasting barely six months, with treatment limited to office visits, x-rays, an MRI,

---

[13] *Ramos v. Sec'y of Health & Human Servs.*, No. 18-1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021 (awarding $40,000.00 in pain and suffering); *Mejias v. Sec'y of Health & Human Servs.*, No.19-1944V, 2021 WL 5895622 (Fed. Cl. Spec. Mstr. Nov. 10, 2021 (awarding $45,000.00 in pain and suffering); *McGraw v. Sec'y of Health & Human Servs.*, No. 21-72V, 2024 WL 1160065 (Fed. Cl. Spec. Mstr. Feb. 15, 2024) (awarding $37,500.00 in pain and suffering); and *Valdez v. Sec'y of Health & Human Servs.*, No.21-394V, 2024 WL 1526536 (Fed. Cl. Spec. Mstr. Feb. 28, 2024) (awarding $35,000.00 in pain and suffering).

and Traumeel injections. *Id.* And *Valdez* involved seven months of conservative treatment, including a petitioner who declined a steroid injection because her pain was not severe enough. *Id.* at *6. *Ramos* involves a lengthier initial treatment delay, and Petitioner argues a shorter overall injury – although I find the injury duration in this case to be similar to that in *Ramos*. *Id.*

### C. Appropriate Compensation for Pain and Suffering

I find that Petitioner's injury was largely resolved within 15 months, when she received her second steroid injection in late December 2021. Although she later returned to care in August and September 2022, at that time her pain was "livable" and no active treatment interventions occurred. I also note that this care occurred after a treatment gap of eight months, and occurred during litigation. Moreover, Petitioner's injury was on the milder side, as exemplified by her initial delay in seeking care and significant gaps of four months after her first consultation and five months after her first steroid injection (in addition to the eight month gap after her second steroid injection).

The cases Petitioner cites are not on point. *Marino* was decided seven years ago, at a time when there were only *two* other published reasoned SIRVA damages decisions. *Marino*, 2018 WL 2224736, at *7. As of January 2025, by contrast, there were *270* reasoned SIRVA damages decisions. *Timberlake*, 2025 WL 721730, at *2. And *Attig* was decided over six years ago. In addition, the *Attig* petitioner sought treatment just two weeks after vaccination – much sooner than Petitioner. Both petitioners had similar MRI findings, and both had steroid injections, with Petitioner having two and the *Attig* petitioner having one. The *Attig* petitioner attended more PT. In short, I am not convinced that the award in this case should approach that of *Marino* and *Attig*. Although Petitioner is, of course, free to cite valid precedent, the persuasive value of older damages decisions may be lower, particularly where (as here) those cases are not particularly good comparisons.

The closest cases cited by the parties are *Ramos* and *Mejias*. The *Ramos* petitioner delayed seeking care longer than Petitioner, but once he sought care he did so persistently, without lengthy gaps – contrasted with Petitioner, who not only did not seek care until nearly three months after vaccination, but thereafter had treatment gaps of four and five months during her treatment course. The *Ramos* petitioner had more severe ROM limitations and participated in more PT, but did not receive any steroid injections.

This case also has similarities to *Mejias*. Although the *Mejias* petitioner sought care only two days after vaccination – suggesting a more concerning injury – that case is similar to Petitioner's case in that both petitioners had treatment gaps. However, Petitioner's injury duration is somewhat longer, and she received two steroid injections and attended three PT sessions, while the *Mejias* petitioner did not do PT or receive a steroid injection (though one was offered).

16

Petitioner's case combines significant factors that limited damages in *Ramos* and *Mejias*: the initial treatment delay of *Ramos* and the treatment gap in *Mejias*. And Petitioner obtained good pain relief from her two cortisone injections. I acknowledge that Petitioner was understandably concerned about COVID exposure and protecting loved ones, particularly before receiving COVID vaccinations. However, as Petitioner herself acknowledges, she did not consider her shoulder to be an emergency – and if she had, she would have sought care more urgently.

Because this case combines weaknesses of *Ramos* and *Mejias*, if Petitioner's injury were otherwise comparable, an award lower than both of those cases might be appropriate. However, Petitioner received two steroid injections, while those petitioners did not receive any. And the petitioners in those cases otherwise appear to have had more ROM limitations, but a shorter overall duration. Although I find that Petitioner's injury was largely resolved by December 2021, the record does support that she had some residual pain at the two-year mark the following year, bolstering the value of her claim somewhat. Arriving at a pain and suffering award is not an exact science. Having reviewed the record and considered the pleadings, I find that a pain and suffering award of $40,000.00 is fair and appropriate.

### D. Travel Expenses for Medical Care – Mileage

The parties disagree what rate should be applied for Petitioner's travel related to treatment of her vaccine injury. I have addressed this question, and Respondent's arguments on the matter, in several decisions. *Walter v. Sec'y of Health & Human Servs.*, No. 21-1461V, 2024 WL 1299576 (Fed. Cl. Spec. Mstr. Feb. 27, 2024); *Tappendorf v. Sec'y of Health & Human Servs.*, No. 20-1592V, 2024 WL 1299566 (Fed. Cl. Spec. Mstr. Feb. 23, 2024); *Kleinschmidt v. Sec'y of Health & Human Servs.*, No. 20-0680V, 2023 WL 9119039 (Fed. Cl. Spec. Mstr. Dec. 5, 2023); *Gibson v. Sec'y of Health & Human Servs.*, No. 20-0243V, 2022 WL 17820891 (Fed. Cl. Spec. Mstr. Oct. 5, 2022).

Despite Respondent's views of *Williams,* I have embraced its holding as more in sync with the remedial goals of the Program (awarding petitioners their actual unreimbursable expenses – which includes not just the operating costs of a vehicle, but also the fixed costs that the "business rate" takes into consideration). *Tappendorf*, 2024 WL 1299566, at *6. As such, application of the business rate results in a reasonable award. Accordingly, I award reimbursement for travel expenses related to Petitioner's agreed-upon out-of-pocket expenses at the "business rate." This results in an award of $302.34 for Petitioner's unreimbursed expenses (the agreed-upon medical expenses of $267.90, [14] plus travel expenses of $34.44).

---

[14] The parties agree that this amount is reimbursable. Resp. at *21 n.13; Ex. 16.

**Conclusion**

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that Petitioner suffered an injury that meets the definition for a Table SIRVA and is entitled to compensation. I find that $40,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.[15] Additionally, I find that Petitioner is entitled to **$302.34 in out of pocket expenses.**

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum of $40,302.34, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[16]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[15] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[16] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.